## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

GEORGE NATHANIEL RIDDICK, JR.,          )
                                        )
     Plaintiff,                       )
                                        )
v.                                      )          Case No.: 2:12-cv-34
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner, Social Security           )
Administration,                         )
                                        )
     Defendant.                       )
                                        )

## REPORT AND RECOMMENDATION

Before the Court is a challenge to the final decision of the Defendant, the Commissioner

of the Social Security Administration ("Commissioner"), who denied the Plaintiff's, George

Nathaniel Riddick, Jr. ("Mr. Riddick"), October 17, 2006, applications for disability insurance

benefits and supplemental security income under the Social Security Act ("Act"), brought

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and a

May 25, 2012, order.    For the following reasons, the Court RECOMMENDS that the

Commissioner's decision be AFFIRMED.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Mr. Riddick applied for DIB and SSI on October 17, 2006, claiming a disability that

began on September 28, 2006. R.[1] 148-61.  His claim was initially denied on March 9, 2007, and

---

[1] "R." refers to the certified administrative record of proceedings relating to this case, filed under seal pursuant to
Local Civil Rule 7(C)(1).

again after reconsideration on August 1, 2007. R. 83-86. Mr. Riddick requested a hearing by an Administrative Law Judge ("ALJ"), who, after a hearing on March 11, 2008, denied his claim. R. 87-99. He appealed to the Appeals Council, which, on August 28, 2009, reversed the ALJ's decision and remanded in order for the ALJ to:

1. Obtain additional evidence concerning Mr. Riddick's impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence;

2. Enter into the record the letter from Mr. Riddick's representative dated September 26, 2008;

3. Further evaluate Mr. Riddick's earnings since September 28, 2006;

4. Further evaluate Mr. Riddick's mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c).

5. Give further consideration to Mr. Riddick's maximum residual functional capacity during the entire period at issue and provide a rationale with specific references to evidence of record in support of assessed limitations;

6. Further, if necessary, obtain evidence from a medical expert, preferably a board-certified psychiatrist, to clarify the nature and severity of Mr. Riddick's mental impairments; and

7. If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Mr. Riddick's occupational base.

R. 102-04.

On remand, in a decision issued on July 26, 2010, another ALJ found that Mr. Riddick had not engaged in substantial gainful activity since his alleged disability onset date, September 28, 2006,[2] and that he met the insured status requirements under the Act through December 31, 2014. R. 24. The ALJ determined that Mr. Riddick suffered severe physical and mental impairments, specifically a cognitive disorder, depressive disorder, history of polysubstance abuse, radiculopathy, and obstructive sleep apnea, and that "for the period that [Mr. Riddick] continued to use drugs and alcohol, ... he met the listing at 12.04." R. 27. The ALJ also determined that if Mr. Riddick stopped his substance abuse, he would not have an impairment or combination of impairments that meets or medically equals any of the listed impairments. *Id.* The ALJ further determined that if Mr. Riddick stopped his substance abuse, he would maintain the residual functional capacity ("RFC") to perform a limited range of light work, except he could only perform jobs that do not require work at dangerous heights or dangerous machinery, and he could only perform jobs that require simple, routine, and repetitive tasks due to his mental impairments. R. 28. Even if Mr. Riddick stopped his substance abuse, the ALJ found that he would be unable to perform past relevant work[3] but that other jobs existed in significant numbers in the national economy that he can perform. R. 31, 33. The ALJ ultimately found Mr. Riddick was not disabled under the Act. R. 33.

Mr. Riddick appealed the ALJ's July 26, 2010, decision to the Appeals Council. R. 14-17. On November 15, 2011, the Appeals Council found no basis in the record or the reasons advanced on appeal to review the decision, denied review, and adopted the ALJ's decision as the

---

[2] The ALJ gave Mr. Riddick the benefit of the doubt when he testified that he worked as a flagger, but the income he received from this work was not enough for substantial gainful activity, and the remainder of the substantial money he reported was from container royalties and disability insurance. R. 24.

[3] Mr. Riddick's past relevant work included that of a longshoreman, a tractor-trailer driver, and a forklift operator. R. 31.

final decision of the Commissioner. R. 1-6. Mr. Riddick timely filed his Complaint in this Court seeking judicial review of the Commissioner's decision denying his claim. ECF No. 1. The parties filed Cross-Motions for Summary Judgment and briefs in support on June 28 (Mr. Riddick) and July 30 (Commissioner), 2012. ECF Nos. 9-12. Mr. Riddick replied to the Commissioner's brief in support on August 13, 2012. ECF No. 13. The Motions are, therefore, ripe for disposition.

## II. ANALYSIS

### A. Legal Standard

The Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *Hays v. Sullivan*, 907 F.2d 1453 (4th Cir. 1990); *Shively v. Heckler*, 739 F.2d 987 (4th Cir. 1984). The regulations grant some latitude to the Commissioner in resolving conflicts or inconsistencies in the evidence which the court is to review for clear error or lack of substantial evidentiary support. *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996). In all, if the Commissioner's resolution of the conflicts in the evidence is supported by substantial evidence, the Court is to affirm the Commissioner's final decision. *Laws v. Celebrezze*, 368 F.2d 640 (4th Cir. 1966).

Additionally, because Mr. Riddick's case involves substance abuse which contributed to his impairments, the ALJ must conduct a further analysis to determine whether the claimant would still be disabled if he stopped using alcohol or drugs. 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled."). The Social Security Administration rules explain that "if we find that you are

disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a); *see McGhee v. Barnhart*, 366 F. Supp. 2d 379, 389 (W.D. Va. 2005) (citing *Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001); *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)). Thus, the ALJ must first conduct the five-step inquiry accounting for all of the medical evidence. If the ALJ determines that the claimant is not disabled, then the claimant is not entitled to benefits. If, however, the ALJ determines that the claimant is disabled, and there is medical evidence of substance abuse, the ALJ must then determine whether the claimant would still be disabled if he or she discontinued substance use. *Id.*

## B. Assignments of Error

Mr. Riddick argues the ALJ erred by: (1) failing to properly evaluate his mental impairment, low IQ, and Global Assessment of Functioning ("GAF") scores; (2) rejecting the medical opinions of Drs. Angela Mercer ("Dr. Mercer"), Michael Bohan ("Dr. Bohan"), and Thomas Fernando ("Dr. Fernando"); and (3) failing to follow the Appeals Council's instructions on remand. ECF No. 10 at 12, 17, 23. The Court will take each argument in turn.

### 1. ALJ's evaluation and application of Mr. Riddick's mental impairments, low IQ, and GAF scores

Mr. Riddick argues his "severe cognitive deficits and difficulty" did not support the ALJ's finding that he could perform simple, routine, and repetitive tasks because "the State Agency opinions from [Disability Determination Services ("DDS")] physicians [] stated that [he] is not able to understand, remember, and carry out detailed instructions." *Id.* at 13.

Dr. Daniel Walter ("Dr. Walter"), a DDS record reviewer, assessed Mr. Riddick's RFC

on March 7, 2007. R. 489-92. He determined Mr. Riddick has "medically determinable impairments of Cognitive Disorder, NOS with dyslexia, Major Depression, Recurrent, [and] Alcohol and Cocaine Dependence," R. 491, found he has moderate difficulties in maintaining social functioning, concentration, persistence, or pace, R. 485, and further found he is moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (6) maintain socially appropriate behavior to adhere to basic standards of neatness and cleanliness; and (7) set realistic goals or make plans independently of others, R. 489-90. Nonetheless, Dr. Walter wrote:

> [Mr. Riddick's] statements are found to be partially credible. Although he was assaulted and was in a coma in 2004, he reportedly recovered fully and worked for 2 more years. His job termination was drug-related, so he lied at intake about this. His presentation at the CE examination was suspect, with test scores that are impossibly low for his adaptive functioning, and he walked with a cane, though no problems with gait were noted on a physical exam in the hospital a week before. He does not take prescribed medication.

R. 492. Dr. Walter concluded that Mr. Riddick's "mental impairments do not prevent [him] from accomplishing the simple and repetitive tasks on a full time and regular basis." *Id.* A second DDS record reviewer, Dr. David Deaver ("Dr. Deaver"), arrived at the same findings and conclusion as Dr. Walter in an RFC assessment conducted on July 31, 2007. R. 612, 615-16, 617. Dr. Deaver also found that Dr. Bohan's "diagnosis of *suspected* mild cognitive defects[] does not support [Mr. Riddick's] inability to work." R. 618 (emphasis in original).

Mr. Riddick argues the ALJ erred by "completely ignoring these assessments from the

DDS record reviewers and fail[ing] to discuss these limitations in his decision," ECF No. 10 at 14, pursuant to 20 C.F.R. § 404.1527(e)(2)(i), which requires ALJs to "consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence."[4] In fact, however, the ALJ specifically referred to the DDS psychological consultants' assessment that Mr. Riddick "exhibited some of the signs and symptoms listed in paragraph 'A' of listings 12.02, 12.04 and 12.09, and that the evidence did not establish the presence of the 'B' or 'C' criteria of listing 12.04." R. 27. And the ALJ disagreed with this conclusion, finding Mr. Riddick met the listing at 12.04 and satisfied the "C" criteria to the extent the ALJ found him disabled while using drugs and alcohol. *Id.* Furthermore, in his decision, the ALJ explicitly stated he considered opinion evidence in determining Mr. Riddick's RFC, R. 29, meaning he considered the assessments of the DDS psychological consultants. This is a reasonable conclusion in light of the ALJ references earlier in his decision to these assessments. R. 27. Notably, too, the ALJ found Mr. Riddick is capable of performing jobs requiring simple, routine, and repetitive tasks, R. 28, which is precisely the same conclusion reached by Drs. Walter and Deaver, R. 492 ("The mental impairments do not prevent the claimant from accomplishing the simple and repetitive tasks on a full time and regular basis."), R. 619 ("The mental impairments do not prevent the claimant from accomplishing simple and repetitive tasks on a full time and regular basis."). For these reasons, the ALJ did not err.

Mr. Riddick also argues the ALJ did not consider his GAF scores that were assigned by Dr. Bohan, Mr. Riddick's treating physician, in determining whether Mr. Riddick could have

---

[4] Contrary to Mr. Riddick's citation to 20 C.F.R. § 404.1527(f)(2), subsection (f)(2) no longer exists; it is now subsection (e)(2).

substantial gainful employment.

Dr. Bohan began treating Mr. Riddick on January 6, 2006, when he was admitted to the Virginia Beach Psychiatric Center for chemical dependency. R. 379-89. Between this date and April 9, 2007, Mr. Riddick was readmitted and discharged on numerous occasions from the Center and a partial hospitalization program for chemical dependency issues. Dr. Bohan treated Mr. Riddick throughout this time, and on multiple occasions he assigned Mr. Riddick various GAF scores. For example, when he was first admitted to the center, Dr. Bohan assigned him a GAF of 30.[5] This increased to 32 six days later.[6] In March 2006, Mr. Riddick received a GAF of 40 upon his discharge from the partial hospitalization program. On October 9, 2006, this decreased to 32, only to increase to 35 upon discharge. On January 5, 2007, Mr. Riddick received a GAF of 40, which decreased a week later to 28. Upon discharge, Mr. Riddick was assigned a GAF of 32, which increased to 40 on April 9, 2007. R. 348-51, 389-91, 397, 398, 539, 415.

"The GAF score 'reflects a clinician's subjective judgment of a patient's overall level of functioning' at the time of evaluation." *Allen v. Comm'r of Soc. Sec.*, No. 2:09cv265, 2010 WL 1142031, at *10 (E.D. Va. Feb. 24, 2010) (quoting *Stoddard v. Astrue*, No. 08-00994 AJW, 2009 WL 2030349, at *10 n.3 (C.D. Cal. July 8, 2009)); *see Brown v. Astrue*, No. 7:08cv003, 2008 WL 5455719, at *5 n. 6 (W.D. Va. Dec. 31, 2008) ("A GAF score is a snapshot of a person's functioning at a particular point in time, and is not a longitudinal indicator of the person's functioning."). The Court has previously acknowledged that courts appear to be split over

---

[5] A GAF of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations; serious impairment in communication or judgment; or an inability to function in almost all areas. *Borth v. Astrue*, No. 7:08CV00355, 2009 WL 803324, at *3 n.3 (W.D. Va. Mar. 26, 2009) (citation omitted).

[6] A GAF of 31 to 40 indicates some impairment in reality testing or communication; or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* at *3 n.4.

whether an ALJ must "specifically consider a GAF score provided by a treating physician when assessing the claimant's RFC, and explain the reasons for crediting or discrediting the score." *Allen*, 2010 WL 1142031, at *10 (discussing cases).

The SSA has noted that the GAF scale does not correlate directly with the criteria for evaluating disability based on mental impairments. *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746–01, 50764–65 (Aug. 21, 2000). Courts in this circuit have generally adhered to this position. *See, e.g., Harvey v. Astrue*, No. 1:10CV00074, 2011 WL 4381150, at *5-6 (W.D. Va. Sept. 21, 2011); *Davis v. Astrue*, No. JKS 09–2545, 2010 WL 5237850, at *3 (D. Md. Dec. 16, 2010); *Lucas v. Astrue*, No. 1:09cv365, 2010 WL 2977266, at *10 (E.D. Va. May 17, 2010); *Criswell v. Astrue*, No. 2:08cv00023, 2009 WL 1351515, at *6 (W.D. Va. May 14, 2009). Moreover, the ALJ is not required to evaluate in writing every piece of medical evidence in the record. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*); *see Wyatt v. Bowen*, No. 89–2943, 1989 WL 117940, at *4 (4th Cir. Sept. 11, 1989) ("[T]he duty of explanation will be satisfied when the ALJ presents 'us with findings and determinations sufficiently articulated to permit meaningful judicial review.'") (unpublished opinion) (citations omitted).

Although the ALJ did not specifically refer to Mr. Riddick's GAF scores that were assigned by Dr. Bohan, the ALJ explained that he arrived at a RFC determination after "consider[ing] opinion evidence." R. 29. Dr. Bohan assigned Mr. Riddick six GAF scores between his alleged disability onset date of September 28, 2006, and the ALJ's decision.[7] These scores were assigned during observation and treatment at the Virginia Beach Psychiatric Center

---

[7] The Court excludes three of the scores in its analysis because they were assigned before Mr. Riddick's alleged disability onset date.

and in a partial hospitalization program for chemical dependency. Mr. Riddick, however, was assigned a higher score by Dr. Roger De Lapp ("Dr. De Lapp"), a clinical psychologist who performed a psychological examination in February 2007. R. 463-68. During this examination, Mr. Riddick received a score of 55,[8] R. 468, which is substantially higher than the score of 40 assigned by Dr. Bohan approximately two months later, R. 538. Although given little weight by the ALJ, R. 30, even Dr. Fernando, in an independent psychiatric evaluation performed on October 9, 2007, assigned Mr. Riddick a current GAF score of 50 and a GAF score of 65 during the past year. R. 624. These scores are also substantially higher than the last score assigned by Dr. Bohan approximately six months before.

The Sixth Circuit has acknowledged that although "a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." *Howard v. Commissioner of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Mr. Riddick's claim that the ALJ erred by not considering the GAF scores assigned by Dr. Bohan is weakened by the fact that the ALJ did reference these scores earlier in his decision when assessing Mr. Riddick's mental impairments and concluding he met the listing at 12.04 and satisfied the "C" criteria. R. 26. The fact the ALJ made this earlier reference supports the position that he considered, but otherwise rejected, these scores in his assessment of Mr. Riddick's RFC. Further weakening Mr. Riddick's claim is the fact that the ALJ also referenced the GAF score assigned by Dr. De Lapp, an opinion with which he gave great weight, such that, at the very least, the ALJ considered one GAF score in assessing Mr. Riddick's RFC. R. 30. Moreover, Dr. Bohan's scores were assigned during a period when Mr. Riddick was actively seeking treatment for chemical dependency. The ALJ

---

[8] GAF scores between 51 and 60 represent moderate symptoms or a moderate difficulty in social, occupational, or school functioning. *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 436 n.1 (6th Cir. 2012) (citation omitted).

previously found, based in part on Dr. Bohan's evaluations, that Mr. Riddick, by using drugs and alcohol, met the listing at 12.04. R. 27. To the extent these scores were helpful to the ALJ in determining whether Mr. Riddick is disabled, they do not carry the same weight in determining his RFC absent his chemical dependency. The ALJ, therefore, did not err.

Finally, Mr. Riddick argues the ALJ "did not properly incorporate the findings of" his IQ, as evaluated by Dr. Dana Sari ("Dr. Sari"), in assessing his RFC. ECF No. 10 at 16-17.

Dr. Sari, a clinical psychologist, conducted a neuropsychological evaluation of Mr. Riddick on June 6, 2007,[9] R. 666-69, wherein she determined he had borderline/low average intellectual functioning with a fourth-grade reading level, R. 668, and fine motor difficulties, R. 30. She also determined his sleep apnea could contribute to his memory difficulties. R. 30 (citations omitted). The ALJ specifically cited these findings in his decision, noting they were consistent with Dr. De Lapp's findings and giving them great weight as to his determination of Mr. Riddick's RFC. *Id.* But Mr. Riddick disagrees with the way in which the ALJ incorporated Dr. Sari's findings, questioning how the ALJ could find that he was able to perform only work that requires simple, routine, and repetitive tasks after giving great weight to Dr. Sari's evaluation of his intellectual and motor functioning. To Mr. Riddick, the two appear incompatible.

Dr. De Lapp tested Mr. Riddick's mental status intelligence and memory on February 28, 2007, R. 463-68, and he arrived at results that are similar to Dr. Sari's: a verbal IQ of 63, compared to Dr. Sari's 81; a performance IQ of 56, compared to Dr. Sari's 74; and a full-scale IQ of 56, compared to Dr. Sari's 76, R. 465, 667. In fact, Dr. De Lapp's scores are lower than

---

[9] The copy of the test results and summary and recommendations contained in Dr. Sari's evaluation and filed with the Court is partially indecipherable. *See, e.g.*, R. 667-69. However, the parties do not appear to disagree as to the contents of the evaluation.

Dr. Sari's. Notwithstanding these scores, Dr. De Lapp determined Mr. Riddick has a constitutionally limited intellect that is further compromised by his dyslexic condition, R. 467, and concluded he is capable of performing simple and repetitive tasks and possible more complex tasks, such as driving a forklift and loading and unloading ships, R. 468. Dr. De Lapp also determined there is nothing about Mr. Riddick's mental status or mental health problems that would preclude his being in regular attendance at work or working on a consistent basis. R. 468. If Dr. De Lapp could arrive at IQ scores that are lower than Dr. Sari's and, nonetheless, find that Mr. Riddick is able to do work that required simple, routine, and repetitive tasks, the ALJ did not err in giving both opinions great weight and embracing Dr. De Lapp's finding as to Mr. Riddick's RFC, even if Dr. Sari's evaluation is silent in this respect.

### 2. Rejection of the opinions of Drs. Mercer, Bohan, and Fernando

In considering a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence" in the record. 20 C.F.R. § 416.945(a)(1), (a)(3). If the medical evidence, including all medical examinations by all physicians, is consistent, then the ALJ makes a determination based on all the evidence. *Id.* § 416.927(c)(1). However, if any of the evidence is inconsistent, the ALJ must decide which evidence should receive controlling weight. *Id.* § 416.927(c)-(d). A treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is not inconsistent with other substantial evidence in the record. *See Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(c)(2); SSR 96–2p.

However, if the treating source's opinion is not well-supported by medically acceptable techniques or is inconsistent with the other substantial evidence, the treating physician's opinion

will not be given controlling weight. *Baxter v. Astrue*, No. 3:11-CV-679, 2013 WL 499338, at *4 (E.D. Va. Feb. 7, 2013) (citation omitted). The treating physician's opinion will also not be given controlling weight if the physician opines on an issue reserved for the Commissioner, such as whether the claimant is disabled for employment purposes. *See Jarrells v. Barnhart*, No. 7:04–CV–411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *accord* 20 C.F.R. § 404.1527(d)(3), (e). If the opinion is deemed not controlling, then the ALJ determines the weight of the opinion by considering the factors in 20 C.F.R. § 404.1527: the length, nature, and extent of the treatment relationship; frequency of examinations; supportability by relevant evidence; consistency with the record as a whole; the physician's degree of specialization; and any other factors tending to support or contradict the opinion. *See* § 404.1527(c)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). In light of these principles, Mr. Riddick argues the ALJ improperly rejected the opinions of his treating physicians and the DDS medical consultant by giving Dr. Fernando's, an independent psychiatric examiner, opinion little weight, Dr. Mercer's, a treating physician, opinion "some weight," and no weight to Dr. Bohan's opinion. The Court will take each opinion in turn.

Dr. Fernando's first psychiatric examination of Mr. Riddick was performed on October 9, 2007. R. 622-24. He diagnosed Mr. Riddick with recurrent major depression and cocaine and alcohol dependence that is in partial remission and concluded that he is too disabled to be a crane operator and that he is permanently disabled. R. 623-24. A second psychiatric examination was performed on September 23, 2009. R. 661-63. Dr. Fernando diagnosed Mr. Riddick, again, with recurrent major depression and cocaine and alcohol dependence that is in remission and determined that he still suffers from impaired judgment and cognitive defects that are impairing

13

his daily activities. R. 662. He, again, concluded that Mr. Riddick is unable to be gainfully employed and is too disabled to work. R. 663.

The ALJ agreed with Dr. Fernando's opinion that Mr. Riddick is too disabled to be a crane operator, to which neither party objects, but, nonetheless, gave little weight to his opinion that Mr. Riddick is permanently disabled. R. 30. For example, Dr. Fernando diagnosed Mr. Riddick with recurrent major depression, R. 623, 662, and, as a result, concluded he is permanently disabled. Notwithstanding what the ALJ properly called is a "leap" to a conclusion, R. 30, Dr. Fernando also noted in his 2007 examination that Mr. Riddick has been treated with Cymbalta, which is a serotonin reuptake inhibitor used for relief for major depressive disorder, *Jones v. Astrue*, No. 3:09CV00104, 2009 WL 3834383, at *5 n.10 (E.D. Va. Nov. 16, 2009), but due to financial reasons he has not been able to afford it, R. 623. Furthermore, he says nothing in the 2009 examination about Mr. Riddick taking Cymbalta or that it was prescribed after his 2007 examination. Dr. Bohan, however, has found that when Mr. Riddick takes Cymbalta "it seems to go pretty well." R. 538, which might alter Dr. Fernando's opinion had he examined Mr. Riddick under similar circumstances.

Also, the ALJ objected to Dr. Fernando's reliance on Mr. Riddick's subjective complaints in arriving at his medical opinion when, as it will be discussed, other physicians have expressed concern over Mr. Riddick's reliability and credibility. *See, e.g.*, R. 622-23, 661. More importantly, in his 2009 examination, Dr. Fernando reviewed the same material he reviewed at the 2007 examination, *two years* before, except that he added to the list the results of his examinations from 2007 and 2008. Consequently, the ALJ emphasized the fact that there was no history of therapy sessions and few other mental health treatment notes or any other objective

14

evidence between the 2007 and 2009 examinations to support Dr. Fernando's opinion that Mr. Riddick is permanently disabled. Such a determination, moreover, is not entitled to controlling weight because it is reserved to the Commissioner. *See Jarrells*, 2005 WL 1000255, at *4; *accord* 20 C.F.R. § 404.1527(d)(3), (e). Although the Court acknowledges Dr. Fernando's position as an independent psychiatric examiner, nonetheless, it finds, for the preceding reasons, the ALJ did not err in giving Dr. Fernando's opinion the weight he believed it deserved.

As to Dr. Mercer, she began treating Mr. Riddick on March 1, 2007. R. 621. In a statement completed on July 31, 2007, she diagnosed Mr. Riddick with cervical disc disease and a head injury in light of the following *subjective* symptoms: right upper extremity weakness, an ataxic gait, and numbness, and a July 6, 2007, CT cervical spine study. R. 672. Although Dr. Mercer found he could frequently lift up to ten pounds and occasionally climb and lift eleven to twenty pounds, she also found he could never sit intermittently for more than three hours, stand and walk intermittently for more than one hour, twist/bend/stoop, reach above his shoulder level, operate heavy machinery, and lift anything greater than twenty pounds. R. 673. Dr. Mercer also found he has difficulty with his memory and following instruction. *Id.* On September 25, 2007, she concluded Mr. Riddick is permanently disabled and is no longer able to work as a longshoreman. R. 621, 674.

As an initial matter, Dr. Mercer's conclusion that Mr. Riddick is permanently disabled is not entitled to controlling weight because it is reserved to the Commissioner. *See Jarrells*, 2005 WL 1000255, at *4; *accord* 20 C.F.R. § 404.1527(d)(3), (e). Notwithstanding, Dr. Mercer found Mr. Riddick could never stand or walk intermittently for more than one hour and, therefore, her

objective testing did not fully support a finding of light work.[10] R. 31. The ALJ gave some weight to this opinion, which is challenged by Drs. Seth Tuwiner ("Dr. Tuwiner"), De Lapp, and Sari. *Id.* As stated above, however, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is not inconsistent with other substantial evidence in the record. *See Craig,* 76 F.3d at 590; 20 C.F.R. § 416.927(c)(2); SSR 96–2p.

Here, the ALJ gave great weight to Dr. Tuwiner opinion.[11] R. 29-30, 438. After examining Mr. Riddick, Dr. Tuwiner found, *inter alia,* that he has some cognitive impairment and difficulty with recall, which would affect his ability to function in a work environment, and some neglect to simultaneous stimulation on the right side, which would affect his operating heavy machinery, working around water, elevated heights, or operating a motor vehicle. R. 438. Notwithstanding these findings, Dr. Tuwiner concluded that Mr. Riddick can be expected to stand or walk six hours in an eight-hour day, effectively finding that he was not permanently disabled or disabled to such an extent that he would be unable to do light work. *Id.*

Dr. De Lapp seconded Dr. Tuwiner's findings.[12] After examining Mr. Riddick, Dr. De Lapp found, *inter alia,* that, notwithstanding his low IQ and a cognitive disorder, R. 467, nothing precluded him from regularly attending work, working on a consistent basis, and working a normal workday or workweek, R. 468. In fact, he declined to diagnose Mr. Riddick with mental retardation because, prior to being fired from his job, he had been an independently functioning

---

[10] SSR 83-10 defines light work as requiring a good deal of walking or standing and the full range of light work as requiring standing or walking, off and on, for a total of approximately six hours of an eight-hour workday.
[11] Dr. Tuwiner issued a medical consultant report, which was dictated on February 3, 2007, on behalf of the Virginia Department of Rehabilitative Services. R. 435-39.
[12] Dr. De Lapp issued a psychology report on behalf of the Virginia Department of Rehabilitative Services. R. 463-68.

adult, having held a job as a longshoreman for more than twenty years where he operated a forklift and loaded and unloaded ships. R. 467-68. Like Dr. Tuwiner, the ALJ gave this opinion great weight. R. 30.

Dr. Sari's opinion also supports Drs. Tuwiner's and De Lapp's opinion. Noting that Mr. Riddick was not a reliable historian, R. 649, and after reviewing his medical records and conducting intellectual, language, and visuospatial functioning tests, Dr. Sari found nothing to support neurocognitive dysfunction. R. 652. She also found that the only deficits seen on testing that would indicate a decline in functioning were motor in nature, despite Mr. Riddick's borderline/low average range of intellectual functioning. R. 651-52. Dr. De Lapp, too, commented on Mr. Riddick's reliability and credibility, for example, by noting that Mr. Riddick answered questions that would portray him in the least functional light possible and in the direction that he thought would be influential in assessing him with functional difficulties. R. 470, 471. Issues regarding Mr. Riddick's credibility are especially relevant to the extent Dr. Mercer relied on Mr. Riddick's subjective symptoms in forming her opinion.

Moreover, the only objective finding Dr. Mercer relied on when forming her opinion is Mr. Riddick's CT cervical spine study, R. 672, which only shows mild degenerative disc disease, R. 681. Although Dr. Mercer concluded that Mr. Riddick is permanently disabled because of his disequilibrium and issues with his coordination, R. 674, his CT head study, R. 682, as the ALJ noted, showed no evidence of acute infarction and was negative for a hemorrhage, R. 31. The ALJ, however, did agree with Dr. Mercer's opinion that Mr. Riddick could no longer work as a longshoreman. R. 31-32, 674. Furthermore, Dr. Mercer began treating Mr. Riddick on March 1, 2007, *after* he was terminated from employment and *after* the alleged assault in which he

17

sustained a head injury.[13] R. 674. Yet, the ALJ noted that Mr. Riddick was able to return to work as a longshoreman, crane operator, and later flagman, for a significant period of time, approximately two years, after sustaining his head injury, and was only terminated after testing positive for drugs. R. 27, 31. Despite this fact, Dr. Mercer found, in part, that because of this head injury, Mr. Riddick was permanently disabled and could never sit intermittently for more than three hours and stand and walk intermittently for more than one hour, R. 621, 670, 674, which begs the question how Mr. Riddick was able to properly function in the workplace with this injury for the two years after his alleged assault and before his termination for drug use. Accordingly, the Court finds the ALJ did not err in giving some but not controlling weight to Dr. Mercer's opinions in light of the objective evidence, such as the CT head study, the counter opinions of three other physicians, concerns over Mr. Riddick's reliability and credibility, and his ability to continue to work for two years after sustaining a head injury.

Concerning Dr. Bohan, to the extent Mr. Riddick argues his GAF scores were improperly given no weight, that issue has been discussed *supra* and will not be discussed again here. However, concerning Mr. Riddick's claim that Dr. Bohan's October 30, 2006, opinion was improperly given no weight, the Court finds the ALJ did not err.

On January 6, 2006, Mr. Riddick was admitted to the Virginia Beach Psychiatric Center, where he was treated by Dr. Bohan for chemical dependency. R. 379-89. He was discharged on January 12, 2006, *id.*, and was admitted the next day to a partial hospitalization program for chemical dependency, which lasted until March 1, 2006, R. 389-92. On October 5, 2006, Mr. Riddick was readmitted to the Center, again, for chemical dependency.[14] R. 393-95. He was

---

[13] This alleged assault occurred approximately two years before he was terminated from employment. R. 24, 464.
[14] He was also admitted for suicidal ideation. R. 393-95.

18

discharged on October 8, 2006, *id.*, and was readmitted the next day to the same program, again, for chemical dependency, which lasted until October 30, 2006, R. 396-400. During his readmission to the Center, Mr. Riddick complained of a head injury from 2004, denied experiencing headaches, defective vision, hearing problems, dizziness, joint pain, muscle pain, problems with equilibrium or numbness, but admitted he experiences chronic back pain and occasional paresthesia into his arms. R. 393-94. He was found to have normal cerebellar function and gait with good motor strength. R. 395. However, during his readmission to the program, it was noted that Mr. Riddick was experiencing numbness in his back and head. R. 396. There was also no abnormality in memory testing, and Mr. Riddick appeared to have low average intelligence. R. 397. He was diagnosed with alcohol, cocaine, and nicotine dependence, recurrent major depression, a head injury, and chronic back pain. R. 398.

On the date of Mr. Riddick's discharge, Dr. Bohan completed a medical evaluation in which he concluded Mr. Riddick was unable to work for one year because of chronic back pain and a closed head injury with mild to moderate cognitive disorder. R. 514. Dr. Bohan also concluded Mr. Riddick was limited in cognition and in his ability to lift objects greater than ten pounds, bend over, stoop down, reach for objects, sit or stand for more than one hour at a time, and drive a car. R. 513. Moreover, Dr. Bohan recommended Mr. Riddick see a physical medicine specialist to determine his current and future work capacity. *Id.*

In his decision, the ALJ explicitly stated he considered opinion evidence in determining Mr. Riddick's RFC, R. 29, meaning he considered Dr. Bohan's October 30, 2006, medical evaluation. This conclusion is all the more reasonable in light of the ALJ references earlier in his decision to Dr. Bohan's notes. R. 26. Had the ALJ assigned at least some weight to this medical

evaluation, he would have referred to it when discussing Mr. Riddick's RFC, but he did not.

Again, the Court is cognizant that a treating physician's opinion, like Dr. Bohan's, must be given controlling weight if: (1) it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and (2) is not inconsistent with other substantial evidence in the record. *See Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(c)(2); SSR 96–2p. But Dr. Bohan's October 30, 2006, medical evaluation meets neither one of these prongs. Although he concludes Mr. Riddick was unable to work for one year because of chronic back pain and a closed head injury and was limited in certain physical abilities, R. 513-14, he does not base this opinion on any objective evidence; rather, the only evidence to support these opinions is Mr. Riddick's subjective symptoms, and, as stated previously, other physicians have expressed concern over Mr. Riddick's credibility and reliability. *See, e.g.*, R. 649, 470, 471. Furthermore, evaluations performed only weeks before when Mr. Riddick was readmitted to the Center and the program belie Dr. Bohan's conclusions. Specifically, although Mr. Riddick was diagnosed with a head injury and chronic back pain, R. 398, he denied experiencing headaches, defective vision, hearing problems, dizziness, joint pain, muscle pain, problems with equilibrium or numbness, R. 393-94, and was found to have normal cerebellar function and gait with good motor strength. R. 395. Also, in an assessment performed on January 5, 2007, Dr. Bohan recommended Mr. Riddick get neuropsychological testing to determine his level of disability and brain injury. R. 539. Dr. Sari performed such testing on June 6, 2007, and found no evidence to support neurocognitive dysfunction related to his reported head injury, R. 669, an opinion with which the ALJ gave great weight, R. 31.

For these reasons, the ALJ did not err in not specifically discussing Dr. Bohan's October

30, 2006, medical evaluation in assessing Mr. Riddick's RFC.

*3. Appeals Council's Instructions on Remand*

Finally, Mr. Riddick argues the ALJ did not follow the instructions of the Appeals Council when the case was remanded because the ALJ failed to evaluate his mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a as it concerns the consideration of his cognitive deficits, low IQ, and GAF scores. ECF No. 10 at 23. Mr. Riddick also argues the ALJ did not follow the Appeals Council's instructions because he did not properly consider the medical evidence in the record from treating physicians and medical sources, including DDS consultants and record reviewers. *Id.* at 23-24.

These arguments simply are restatements of Mr. Riddick's earlier arguments in the context of the Appeals Council's instructions. Because the Court finds the ALJ did not err in his evaluation and application of Mr. Riddick's mental impairments, low IQ, and GAF scores and the weight he gave to the opinions of Drs. Mercer, Bohan, and Fernando, the Court further finds the ALJ did not err in following the instructions of the Appeals Council.

## III. RECOMMENDATION

For these reasons, the Court RECOMMENDS the Commissioner's Motion for Summary Judgment, ECF No. 11, be GRANTED, Mr. Riddick's Motion for Summary Judgment, ECF No. 9, be DENIED, and the case be DISMISSED.

## IV. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, Mr. Riddick is notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C)

and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019, 106 S. Ct. 567 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208, 104 S. Ct. 2395 (1984).

The Clerk is DIRECTED to forward a copy of this Report and Recommendation to all counsel of record. The Clerk is further DIRECTED to amend the name of the Defendant in the caption of the case to read "Carolyn W. Colvin, Acting Commissioner, Social Security Administration."

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 28, 2013

22

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Charlene A. Morring
Montagna Klein Camden LLP
425 Monticello Avenue
Norfolk, Virginia 23510
Counsel for the Plaintiff

Kent Pendleton Porter
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Counsel for the Defendant

Fernando Galindo
Clerk of the Court

By:

Deputy Clerk
February 28, 2013